OPINION OF THE COURT
Kaye, J.
The question raised by this appeal is whether the doctrine of vested rights or res judicata bars a second administrative proceeding — where the first has failed — for automatic revocation of petitioners’ nursing home operating certificate owing to their industry-related felony convictions.
 On April 4, 1979, petitioners Louis Hodes and Herman Surkis, owners and operators of Franklin Park Nursing Home (a licensed residential care facility), each entered a plea of guilty to grand larceny in the third degree, based on fictitious *367 invoices and unearned Medicaid reimbursements.[1] Petitioners were sentenced on October 25, 1979 and several months later received certificates of relief from disabilities (Correction Law art 23).[2] For the next eight years — while petitioners continued operating their facility — the Department of Health, the Legislature and the courts have grappled with the issue whether, in such circumstances, nursing home operating certificates may be revoked automatically upon industry-related felony convictions of the persons who control them. Petitioners contend that the issue was forever resolved in their favor by a final judgment in the first administrative proceeding denying automatic revocation, and that this judgment cannot be impaired by subsequent amended legislation requiring revocation of their license. We hold, however, that in the present circumstances neither the vested rights doctrine nor res judicata forecloses a second revocation proceeding under the amended statute.
Central to this appeal is Public Health Law § 2806 (5) as it existed at the time of petitioners’ convictions in 1979, and as thereafter twice amended — once in 1981 and a second time in 1983.
In 1979, Public Health Law § 2806 (5) permitted the Commissioner after a hearing to revoke a nursing home operating certificate if the person controlling the facility was convicted of an industry-related felony (L 1977, ch 896). Upon petitioners’ convictions they were advised that a hearing would be held by the Department of Health to determine whether their operating certificate should be revoked, suspended, limited or annulled by reason of their convictions. The Administrative Law Judge before whom the hearing took place found that petitioners’ felony convictions were sufficient to warrant revocation of their operating certificate and so recommended. By order dated February 24, 1981 the Department of Health revoked petitioners’ operating certificate pursuant to Public *368 Health Law § 2806 (5), finding that they each had been convicted of a felony in connection with an activity or program subject to the regulations of the State Department of Health. Petitioners’ article 78 proceeding challenging the revocation was dismissed by the Appellate Division, and the administrative determination confirmed (see, Matter of Hodes v Axelrod, 84 AD2d 895).
In July 1981 Public Health Law § 2806 (5) was amended, effective immediately, to make revocation of operating certificates mandatory upon a controlling person’s conviction for an industry-related felony (L 1981, ch 607). The accompanying executive memorandum made clear that these amendments addressed a concern that convicted felons were taking advantage of prolonged administrative and judicial revocation proceedings, while continuing to operate facilities that cared for the aged and infirm (1981 McKinney’s Session Laws of NY, at 2604).
On petitioners’ appeal to this court, we reversed the Appellate Division judgment, concluding that the Public Health Law as it existed at the time of our decision — which is the applicable law (see, Strauss v University of State of N Y., 2 NY2d 464, 467, appeal dismissed 355 US 394) — was impermissibly at odds with Correction Law § 701, barring automatic revocation of petitioners’ operating certificate (56 NY2d 930, rearg denied 57 NY2d 775). We recognized that an "unfortunate result” was produced by the interrelationship of Public Health Law § 2806 (5) and Correction Law § 701, but that amelioration was properly for the Legislature (id., at 932).
Within weeks the Legislature responded by amending both Public Health Law § 2806 (5) and Correction Law § 701 (2) specifically to require revocation of nursing home operating certificates upon a controlling person’s industry-related felony conviction, despite a certificate of relief from disabilities (L 1983, ch 584). The amendments were to take effect immediately and "apply to all existing operating certificates even though the felony conviction may have been entered and the certificate of relief from disabilities granted prior to the effective date hereof.” (L 1983, ch 584, § 3.) The sponsoring agency’s memorandum, referring to the nursing home scandals of the mid 1970’s, again took note of the serious situation created by convicted felons continuing to operate health care facilities as review proceedings dragged on. While the 1981 amendments intended to rid the industry of such persons, and to do so expeditiously, several nonetheless continued operating *369 nursing homes. The memorandum further described the result in Hodes v Axelrod (supra), as well as its impact, concluding that the new bill would resolve the "dilemma” by excepting the automatic revocation provisions of the Public Health Law from the bar to automatic relief contained in the Correction Law: "This limitation on the scope of the certificate of relief would resurrect the revocations previously imposed. This will assist in the Department’s continuing efforts to remove convicted felons from the operation and provision of health care services.” (Mem of State Department of Health, 1983 McKinney’s Session Laws of NY, at 2631; see also, 1983 NY Legis Ann, at 254-255.)
Armed with the amended legislation, in 1984 the Commissioner of Health commenced the present proceeding against petitioners under Public Health Law § 2806 (5) to revoke their operating certificate upon a finding that they had been convicted of industry-related felonies. The proceeding was, however, enjoined by Special Term on the ground that petitioners enjoy the protection of "the res judicata effect of the favorable Court of Appeals determination.” A divided Appellate Division affirmed, the majority concluding both that petitioners have a vested property right in the judgment on the merits in their favor, and that the new proceeding is barred by the doctrine of res judicata. In this posture the case comes before us.
As the starting point for our analysis, we agree with the Appellate Division dissenter that the 1983 amendments to Public Health Law § 2806 (5) — explicitly made retroactive by the Legislature — were intended to apply to all licensed operators, even those like petitioners who had litigated the automatic revocation issue to a final judgment in their favor under preexisting law. While clear expression of such purpose is unquestionably necessary (see, e.g., Gleason v Gleason, 26 NY2d 28, 36), that requirement is satisfied both by the literal words of the 1983 amendment and by its history.
The question is whether realization of that legislative objective is precluded either by a vested right petitioners acquired in the judgment or by the doctrine of res judicata. We conclude that neither is a bar to the present revocation proceeding.
The Vested Rights Doctrine
Although a statute is not invalid merely because it reaches back to establish the legal significance of events occurring *370 before its enactment, a traditional principle applied in determining the constitutionality of such legislation is that the Legislature is not free to impair vested or property rights (United States Trust Co. v New Jersey, 431 US 1; 2 Rotunda, Nowak & Young, Constitutional Law § 15.9). The vested rights doctrine recognizes that a "judgment, after it becomes final, may not be affected by subsequent legislation.” (McKinney’s Cons Laws of NY, Book 1, Statutes § 58.) Once all avenues of appeal have been exhausted, under this doctrine a judgment becomes an inviolable property right which thereafter may not constitutionally be abridged by subsequent legislation (id.).
Germania Sav. Bank v Village of Suspension Bridge (159 NY 362) — decided in 1899 — is a representative application of the traditional principle of "vested rights”. In that case, this court had initially denied a motion for leave to appeal in an action on coupon bonds because the statute then in effect did not allow such an appeal absent permission of the General Term when the complaint demanded less than $500; the statute was thereafter amended to remove the monetary limitation. In dismissing a second motion for leave, we held that applying the statute retrospectively in such circumstances would unconstitutionally deprive the defendant of a vested property right: "A judgment is a contract which is subject to interference by the courts so long as the right of appeal therefrom exists, but when the time within which an appeal may be brought has expired, it ripens into an unchangeable contract and becomes property, which can be disposed of or affected only by the act of the owner, or through the power of eminent domain. It is, then, beyond the reach of legislation affecting the remedy, because it has become an absolute right which cannot be impaired by statute.” (Id., at 368; see also, Saltser & Weinsier v McGoldrick, 295 NY 499; Feiber Realty Corp. v Abel, 265 NY 94; Livingston v Livingston, 173 NY 377, 383; Matter of Greene, 166 NY 485, 492.)
Since Germania Sav. Bank (supra), however, the traditional principle has undergone more critical analysis. We have recognized that the vested rights doctrine is conclusory, and indeed a fiction that "hides many unmentioned considerations of fairness to the parties, reliance on pre-existing law, the extent of retroactivity and the nature of the public interest to be served by the law. (Hochman, Retroactive Legislation, 73 Harv. L. Rev. 692.)” (Matter of Chrysler Props. v Morris, 23 NY2d 515, 518.) While there is a persisting aversion to retro *371 active legislation generally (see, e.g., 2 Rotunda, Nowak & Young, Constitutional Law § 15.9), we have noted that the modern cases reflect a less rigid view of the Legislature’s right to pass such legislation and more candid consideration — on a case-by-case basis — of the various policy considerations upon which the constitutionality of retroactive legislation depends (Matter of Chrysler Props. v Morris, 23 NY2d 515, 521-522, supra). "[T]his is an area where broad conclusions are to be studiously avoided for it is impossible to predict in advance how in each concrete case the various factors will line up.” (Id., at 519.)
Balancing the various factors, we hold that the vested rights doctrine does not preclude application of the amended statute to these petitioners.
Examining first the nature of the right petitioners allegedly secured by the judgment, plainly there can be no vested right in their continued operating license; petitioners themselves acknowledge this. The amended legislation does not reopen petitioners’ criminal prosecution. At most, the judgment could give them an advantage over their fellow facility operators whose certificates under the amended law are automatically revoked upon an industry-related felony conviction. It is, further, significant in the balance that petitioners’ alleged right arises as the unfortunate result of an inadvertent gap or anomaly in the interrelationship of two laws, which the Legislature within weeks cured by the amended statute now sought to be enforced. Any reliance by petitioners on the judgment thus would have been the product of a legislatively unintended windfall which was, immediately upon identification, eliminated. (See, Hochman, The Supreme Court and the Constitutionality of Retroactive Legislation, 73 Harv L Rev 692, 705-706.)
To be weighed with these considerations is the fact that petitioners continue to run a public health facility. Nursing homes care for the aged and infirm, and receive State funds for such care under the Medicaid program (see, Social Services Law § 363). There is a public interest in policing this industry and removing persons convicted of industry-related felonies from the operation of nursing homes. That this is a compelling interest is plain not only from the nature of the services offered but also from the publicized scandals that have plagued this industry. Automatic revocation in these circumstances in itself serves the public interest, so that upon *372 conviction such operators may be removed expeditiously; nearly a decade has already elapsed since petitioners’ convictions. The amended statute purports to reach "all existing operating certificates”, thus affecting only those licensees continuing to offer health care to the public. The application of the law to all such persons is rationally related to a legitimate governmental purpose, and results in the equal treatment of licensed operators.
Thus, we conclude that there is a strong public interest to be served by permitting the law to be enforced as amended in 1983, and that in this case the public interest overrides petitioners’ claimed constitutional objection.
Res Judicata
Finding no constitutional impediment in the application of the amended statute to petitioners, we next consider whether the cause of action for automatic revocation was somehow extinguished by the judgment in the prior proceeding, brought under the old law.
Simply stated, where there is a valid final judgment the doctrine of res judicata, or claim preclusion, bars future litigation between those parties on the same cause of action. The doctrine rests not on constitutional underpinnings but on sound public policy considerations. Putting an end to a matter for all time is fair to the party who has endured the cost and travail of a litigation, fair to the party whose claim has once been heard, and in the interest of the judicial system generally (Matter of Reilly v Reid, 45 NY2d 24, 28; 5 Weinstein-Korn-Miller, NY Civ Prac ]f 5011.07; see also, Restatement [Second] of Judgments § 17 et seq.).
While simply stated, the doctrine often eludes ready application because of difficulty determining whether there is the requisite identity between an earlier cause of action and a later one. The fact that causes of action may be separately stated or statable, or invoke different legal theories, will not permit relitigation of claims (Matter of Reilly v Reid, supra, at 19; see also, O’Brien v City of Syracuse, 54 NY2d 353, 357; Smith v Russell Sage Coll., 54 NY2d 185, 192). In this State, we have adopted a "transaction” test for resolving such questions: a judgment extinguishes "all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose”; a "transaction” is determined prag *373 matically, depending on whether the facts form a convenient trial unit and whether their treatment as a unit conforms to the parties’ expectations or business understanding or usage (Restatement [Second] of Judgments § 24; Matter of Reilly v Reid, supra, at 29; see also, Siegel, NY Prac § 442).
Twice recently this court has applied the transaction test where the only real difference between the first and second actions was an intervening change in law. In Matter of John P. v Whalen (54 NY2d 89, 94), we held that res judicata did not bar a second request for documents pursuant to an amended version of the Freedom of Information Law even though the original request was essentially the same and properly denied under preexisting law. The statutory amendment materially changed the parties’ rights such that the new request was independent from the first and thus a wholly distinct transaction. In Matter of Meegan S. v Donald T. (64 NY2d 751), a paternity proceeding was initially dismissed as untimely under the then-applicable two-year Statute of Limitations. The Statute of Limitations was thereafter enlarged to five years and the proceeding was recommenced within the new limitations period. We held that the amended Statute of Limitations was to be applied retroactively and that the second petition was not subject to dismissal on the ground of res judicata: "The issue disposed of by the order of dismissal in the first proceeding, however, was only that petitioner’s claim was untimely under the Statute of Limitations then applicable to paternity suits, and it did not reach the issue of timeliness under the amended law, which would permit petitioner’s claim.” (Id., at 752.)
Although both revocation proceedings instituted against petitioners are based on the same felony convictions, seeking the same remedy, it is equally true that petitioner in John P. twice made virtually the same FOIL requests and plaintiff in Meegan S. twice commenced the same paternity suit. The operative consideration in all three cases is that the statutory rights of the parties were altered between the first and second proceedings. This being so, the two proceedings against petitioners can be said to lack the requisite identity for application of res judicata (see, State Farm Ins. Co. v Duel, 324 US 154, 162).
We find this analysis particularly apt in the present situation because of the public importance of the issues involved (see, Restatement [Second] of Judgments § 28 [2], comment c; *374 § 26 [1] [d]). For compelling reasons in the public interest, the Legislature provided that all persons holding operating certificates at the time of the amended law should be equally subject to automatic forfeiture upon conviction of an industry-related felony. If the pending proceeding against petitioners under the amended statute were precluded by res judicata, petitioners would be left with a license to operate a public health facility despite their convictions and despite the fact that others operating comparable facilities automatically lose their licenses upon comparable convictions.
Petitioners’ arguments in support of res judicata are in the end much the same as their plea for application of the vested rights doctrine — that permitting a second revocation proceeding to go forward against them unfairly impairs rights already adjudicated by this court in the first proceeding. Indeed, the doctrines of vested rights and res judicata — while resting on different foundations and implicating different válues — do have certain common elements, most powerfully a central concern for fairness. In this respect, however, our "vested rights” analysis and conclusions are pertinent. A second revocation proceeding is not unfair to petitioners in any sense that is protected by law; this proceeding is, to the contrary, supported by supervening considerations of public interest that have been properly balanced by the Legislature.
Accordingly, the order of the Appellate Division should be reversed, with costs, and the petition dismissed.
Chief Judge Wachtler and Judges Simons, Alexander, Titone, Hancock, Jr., and Bellacosa concur.
Order reversed, etc.

. A third petitioner, Fred Springer, was also a respondent on this appeal. Springer and his partners in the Park Nursing Home and the Rockaway Nursing Home have entered into voluntary receivership agreements with the State Department of Health and relinquished their operating certificates for these facilities, and the appeal has been withdrawn as to him.

. Correction Law § 701 (2) provided in part that: "Notwithstanding any other provision of law, a conviction of a crime or of an offense specified in a certificate of relief from disabilities shall not cause automatic forfeiture of any license, permit, employment or franchise, including the right to register for or vote at an election, or automatic forfeiture of any other right or privilege, held by the eligible offender and covered by the certificate.”